UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No.: 8:17-cr-409-T-33JSS

JAMES ROBERT GREGG, JR.

_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court on Defendant James Robert Gregg, Jr.'s Dispositive Motion to Suppress Evidence ("Motion") (Dkt. 35) and the Government's response in opposition (Dkt. 40). On November 20, 2017, the Court held an evidentiary hearing on the Motion. Upon consideration of the memoranda, the argument of counsel, and the evidence, the Court recommends that the Motion be denied.

## BACKGROUND

On April 12, 2017, the Government filed a complaint charging Defendant with distribution and possession of child pornography using a mobile device in violation of 18 U.S.C. § 2252(a)(2) and (a)(4). (Dkt. 1.) Defendant was arrested on April 18, 2017, and released on bond pending trial. (Dkts. 7, 9.) On August 23, 2017, a Grand Jury indicted Defendant for knowingly receiving a visual depiction involving the use of a minor engaging in sexually explicit conduct, using any means and facility of interstate and foreign commerce, by any means including by computer, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1). (Dkt. 17.) Defendant was also indicted for knowingly possessing a matter which contained visual depictions of minors engaging in sexually explicit conduct, at least one of which involved a prepubescent minor and a minor who had not attained twelve years of age, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2). (Dkt. 17.) On October 27, 2017, Defendant filed the Motion, seeking to suppress all evidence seized from

Defendant's cell phone and tablet and all evidence derived from the search of both electronic devices.  (Dkt. 35.)

## FINDINGS OF FACT

Homeland Security Investigations ("HSI") Special Agent Tavey Garcia testified that her investigative unit in Tampa, Florida, received an investigative lead from a HSI unit located in Phoenix, Arizona ("Phoenix Unit"), on September 23, 2016.  The Phoenix Unit sent Agent Garcia information gathered during an ongoing child pornography investigation.   During the investigation, the lead agent of the Unit, acting undercover, infiltrated a video-conferencing room that streamed child pornography.   Agent Garcia testified that the video-conferencing room, referred to as "Application A," is a free video-conferencing application that can be used for various streaming purposes.  Users download the application from the company's website and can invite others to an online meeting room accessed with a ten digit code.  (Gov't Ex. 13 ¶ 11.)  Participants in an Application A video-conferencing room have specific usernames.   (Gov't Ex. 13 ¶ 12.) Participants can use the video camera and microphone on their computers to live-stream themselves to other participants or they can display the contents of their own computers for other participants to view.  (Gov't Ex. 13 ¶ 13.)  The participants are listed by their usernames in a separate window, which also includes icons signifying whether the participants are using their cameras, microphones, or both.  (See Gov't Exs. 3(a)–(f).)  The participants may also chat with each other in another window in the application.  The chat dialogue is visible to all participants unless it is made private.  (See Gov't Exs. 3(a)–(f).)

Agent Garcia testified that each participant in Application A has his or her own small window on the screen, and participants can scroll through the various windows to watch the content streamed by other participants.   Each participant's window also displays the participant's

username.  The participants may click on any window to enlarge it while the other windows remain visible around the sides of the larger window.  (See Gov't Exs. 3(a)–(f).)  Agent Garcia further testified that the participants are able to watch what the others are streaming, but they do not know what the other participants are watching.

Agent Garcia testified that the Phoenix Unit's lead agent ("Phoenix Agent") used software to record Application A and the content the other participants were streaming during his undercover investigation.  Specifically, the Phoenix Agent recorded Application A when the participants were streaming child pornography.  The Phoenix Agent was able to capture the participants present in Application A while child pornography was streaming, including the content the participants were streaming in their own windows.  (See Gov't Ex. 3(b).)  Agent Garcia testified that the Phoenix Agent recorded a participant with the username fla stream video of himself wearing only a shirt and masturbating while child pornography was being streamed in Application A by a different participant.

According to Agent Garcia's testimony, the Phoenix Unit subpoenaed Application A for subscriber and login information for usernames observed in Application A while videos depicting child pornography were streaming and visible to participants, including the participant with username fla.  The results linked username fla with an IP address registered to Time Warner Cable that traced to Bright House Networks.  The Phoenix Unit then subpoenaed information from Bright House Networks to find the physical address associated with username fla's IP address.  The physical address was located in St. Petersburg, Florida ("residence") and was associated with Allison Anderson and Defendant.  Defendant's Florida driver's license also listed the residence as his address.  The Phoenix Unit provided this information to HSI in Tampa, Florida.  The information ("investigative lead") included videos recorded from Application A and spreadsheets

listing all the usernames the Phoenix Agent observed using Application A while child pornography was streaming. (See Gov't Exs. 8–12.) The information in the spreadsheets was derived from the results of the subpoenas sent by the Phoenix Unit.

Once she received the investigative lead, Agent Garcia reviewed some of the videos to confirm that username fla was present in Application A while child pornography was streaming. She also confirmed that username fla was Defendant by comparing the video of him to his driver's license picture. (See Gov't Exs. 3(b), 14.) Agent Garcia conducted surveillance to confirm that Defendant lived at the residence. However, because she was unable to identify what Defendant was watching while he used Application A, Agent Garcia testified that she interviewed Defendant to determine whether Defendant was watching child pornography on Application A.

On September 30, 2016, Agent Garcia and Agent Ryan Albritton visited the residence to perform a consensual "knock-and-talk" interview with Defendant. Agent Garcia testified that when Defendant answered the door, she recognized him from his driver's license and from Application A. Defendant agreed to speak with the agents and invited them into the residence. Defendant confirmed that he and Allison Anderson lived in the residence together for approximately three or four years with their three-year-old daughter and Ms. Anderson's older son. Defendant also confirmed that they previously received internet service through Bright House Networks, but it had been discontinued. Agent Garcia testified that Defendant admitted he accessed Application A looking for pornography of adult men, but he became curious about child pornography while accessing the Application. Defendant stated that he felt remorseful after looking at child pornography on Application A and knew it was illegal. He first indicated that the children he saw on Application A were teenagers, but later admitted that he watched pornography of children who appeared to be ten years old. He admitted to viewing child pornography on another

4

website as well.  Agent Garcia testified that Defendant stated he accessed Application A while he was in his living room and his daughter was asleep.  When Agent Garcia asked Defendant what device he used to access Application A, he replied that he used a laptop computer ("laptop").  Defendant provided the laptop and completed a consent-to-search authorization form.  (Gov't Ex. 4.)  Agent Garcia testified that Defendant did not disclose any other devices he used to access Application A and did not indicate that the laptop was not his.  A forensic analyst searched the laptop and found no evidence that Defendant accessed Application A or watched other child pornography on the laptop.  Defendant indicated that he would contact Agent Garcia if he remembered anyone who used Application A.  Agent Garcia testified that at this point in her investigation, she did not believe she had enough evidence to prosecute Defendant and closed the file pending new information.  She further stated that out of an abundance of caution, she contacted the Florida Department of Children and Families, Child Protective Services ("CPS") because Defendant admitted watching child pornography while his minor daughter was in the house.

On October 25, 2016, CPS informed Agent Garcia that it conducted an investigation and found that Defendant had not abused his children.  The CPS employee also informed Agent Garcia that Defendant moved out of the residence to live with his mother in Fort Myers, Florida, and provided Agent Garcia with Defendant's and Ms. Anderson's contact information.  Agent Garcia called Ms. Anderson later that day.  Agent Garcia testified that she called Ms. Anderson because she had not spoken with her regarding the Application A investigation and she wanted to determine whether any additional information was available.

During Agent Garcia's call with Ms. Anderson, Ms. Anderson confirmed that Defendant moved out and that her children were safe.  Ms. Anderson also stated that she was packing Defendant's belongings when she found his LG Android cell phone and RCA tablet (collectively,

"devices") that he left at the residence.  (See Gov't Exs. 1(a)–2(b).)  Ms. Anderson stated that she believed there could be contraband on the devices, and she offered to provide them to Agent Garcia to be searched.

The next day, Agent Garcia met Ms. Anderson at Ms. Anderson's place of work to receive the devices.  Ms. Anderson explained that while Defendant previously used the devices regularly and kept them near him, they were old and he no longer used them.  Defendant replaced the LG Android cell phone ("subject cell phone") with a newer version because its front screen was cracked.  (See Gov't Ex. 1(a).)  Ms. Anderson informed Agent Garcia that she previously accessed the RCA tablet ("tablet") and that Defendant never indicated that he did not want her to handle the devices.  Ms. Anderson further explained that the laptop searched on September 30, 2016, was her work laptop.  Ms. Anderson stated that Defendant moved out because Ms. Anderson asked him to do so in light of the CPS investigation. Ms. Anderson further explained that she continued to communicate with Defendant and he had not asked for any of his possessions, including the devices.

Agent Garcia then showed Ms. Anderson screenshots of the man known as username fla in Application A to see if Ms. Anderson could identify him.  (See Gov't Ex. 6.)  Ms. Anderson identified the top of username fla's head as Defendant and recognized the background in the screenshots as the living room of the residence.  Agent Garcia testified that she had Ms. Anderson complete a consent-to-search form for the devices as it was part of her regular process and provides documentation of the chain of custody.  She also gave Ms. Anderson a receipt for the devices. Agent Garcia then provided Ms. Anderson with her contact information in case Ms. Anderson found the shirt Defendant was wearing in the screenshots or had any questions regarding the investigation.  Agent Garcia testified that she believed the devices contained contraband because

Defendant did not disclose the devices during the initial knock-and-talk.  Agent Garcia further testified that although Ms. Anderson completed a consent-to-search form, she chose to seek a search warrant out of an abundance of caution as Ms. Anderson indicated that the devices belonged to Defendant.  Agent Garcia therefore detained the devices and began her Affidavit in Support of an Application for a Search Warrant ("Affidavit") the following day, October 27, 2016.

Agent Garcia testified that drafting her Affidavit required an extended amount of time as she reviewed all of the information in the investigative lead.  This included examining spreadsheets with a vast amount of information pertaining not only to Defendant, but to other Application A participants as well.  Thus, Agent Garcia sorted through the information for Defendant's username, fla, using the IP address connected to the username and the residence.  (See Gov't Exs. 8–12.) Because Agent Garcia did not create the spreadsheets, she often contacted the Phoenix Agent for confirmation of certain information.  The Phoenix Agent was busy with the ongoing investigation and was not always able to immediately take her calls.  The investigative lead also included approximately six to nine video recordings of the Phoenix Agent's sessions on Application A. Each recording was approximately one hour long.  The recordings were difficult for her to watch without breaks because of the graphic nature of the recordings.  The Phoenix Agent frequently changed the view of Application A during the recordings to obtain information concerning all of the participants, scrolling through and enlarging different windows.  Agent Garcia testified that she had to determine what was being streamed at the time of the recordings, whether Defendant was in the video-conferencing room, and whether Defendant was actively participating.  Further, Agent Garcia had never previously worked with Application A, nor had anyone in the HSI office in Tampa.  As a result, Agent Garcia conducted detailed research into Application A to include a thorough discussion of it in her Affidavit.  (Gov't Ex. 13.)  Agent Garcia testified that the process

was complex and time consuming.  Further, she was often diverted from the case to work on her other open cases and assist with other agents' cases, including conducting surveillance, consulting with forensic analysts, and attending court proceedings.

As a result of reviewing the investigative lead, Agent Garcia determined that username fla participated in Application A on seven days between October 15, 2015, and April 8, 2016, during the Phoenix Agent's investigation.  (Gov't Ex. 8.)   During this timeframe, username fla accessed Application A 126 times using an Android device.  (Gov't Ex. 9.)  Agent Garcia was further able to conclude that within those 126 times, username fla spent 1,628 minutes, or approximately twenty-seven hours, in Application A.  (Gov't Ex. 9.)  Agent Garcia testified that these timeframes only represent the amount of time username fla participated in Application A while the Phoenix Agent was also present in the application.   Agent Garcia also created screenshots of the video recordings where username fla was participating Application A.  (Gov't Exs. 3(c)–(f).)  These screenshots depict the sexual abuse of children, as well as dialogue between participants in the chat window who sought "older" with "younger" child pornography.  (Gov't Exs. 3(c)–(f).)

Agent Garcia testified that while she drafted her Affidavit, Ms. Anderson contacted her to inform her that she did not find the shirt Defendant wore in the screenshots shown to Ms. Anderson and that Defendant knew Agent Garcia had the devices.  Defendant never contacted Agent Garcia to ask about the devices.   Agent Garcia's Affidavit was submitted to the Court and signed on December 7, 2016.  (Gov't Ex. 13.)  The devices were searched that day by a forensic analyst.  The analyst found child pornography on the subject cell phone, but not on the tablet.

On February 15, 2017, Agent Garcia conducted a second knock-and-talk with Defendant.  Agent Garcia traveled to Defendant's mother's home, where Defendant was staying.  Defendant again confirmed that he accessed streaming videos of child pornography.  (Def. Ex. 6 at 15–16.)

He also stated that he knew that Ms. Anderson gave Agent Garcia the devices. (Def. Ex. 6 at 9:19–23.) He stated that he had not used the subject cell phone in over a year because it was "clunky" and did not work well. (Def. Ex. 6 at 9:24–10:7.) Although he was staying at his mother's house, he traveled to the Tampa area every Friday to practice in his band. (Def. Ex. 6 at 12:13–13:5.) Agent Garcia testified that Defendant appeared surprised that there was child pornography on the subject cell phone. As the tablet did not have any contraband on it, Agent Garcia offered to return it to Defendant. (Def. Ex. 6 at 20:17–21:1.) Defendant instructed Agent Garcia to give the tablet to Ms. Anderson for her to give to their daughter. (Def. Ex. 6 at 21:4–5.)

During the evidentiary hearing, Ms. Anderson testified on behalf of the Government. According to Ms. Anderson, she lived with Defendant at the residence with their daughter and her older son for four years. At the time of Agent Garcia's first knock-and-talk with Defendant, Ms. Anderson worked outside the home while Defendant stayed home to care for their daughter. Ms. Anderson testified that she owned the laptop that was searched during the first knock-and-talk. She used it primarily for work and had never seen Defendant use the laptop. Ms. Anderson identified the subject cell phone as belonging to Defendant and explained that Defendant kept the subject cell phone on his person or near him almost constantly. She did not use the subject cell phone, but Defendant never indicated that she could not use the subject cell phone. According to Ms. Anderson's testimony, Defendant stopped using the subject cell phone when its front screen broke. Defendant bought a new cell phone and kept the same phone number. He then placed the subject cell phone in a drawer in a bedside table in their shared bedroom. Ms. Anderson never saw Defendant use the subject cell phone again. Ms. Anderson further testified that Defendant did not use the tablet often because it did not work well. She further testified that she used the tablet

once to search Defendant's e-mail because she believed he was having an affair.  Defendant never indicated that she could not use the tablet.

Ms. Anderson testified that employees from CPS contacted her in October 2016 and visited the residence, stating that they were investigating Defendant's use of child pornography and possible abuse of their children.  Defendant had not mentioned Agent Garcia's initial knock-and-talk to Ms. Anderson.  The CPS employees explained to Ms. Anderson that if Defendant did not leave the residence, her children may be placed into foster care.  After CPS left, Ms. Anderson questioned Defendant about his use of child pornography.   He admitted viewing child pornography.  Ms. Anderson asked Defendant to leave the residence because she did not want him in the house or around the children.  Defendant went into their bedroom, closed the door, then returned with a duffel bag full of his belongings and his guitar case.  Defendant left his key to the residence and drove to his mother's house using Ms. Anderson's van.  Ms. Anderson testified that Defendant took his new cell phone with him and they spoke on the phone while he drove.  She told him that she wanted him to return the van.  Ms. Anderson testified that Defendant did not mention the devices.  He did not ask Ms. Anderson to safeguard the devices for him until he could collect his remaining items and never requested that she send the devices to him at his mother's house.

Ms. Anderson and Defendant continued to keep in touch while he stayed at his mother's house.  Ms. Anderson testified that Defendant never asked for his belongings that remained at the residence.  Ms. Anderson continually asked Defendant to return for his remaining belongings and told him that she would pack for him.  Ms. Anderson testified that while packing his belongings, she found the subject cell phone and tablet in a bedside table and shared closet, respectively, of their shared bedroom.  When Agent Garcia called her, she mentioned the devices and offered to

give them to Agent Garcia because she thought they may be important to the investigation.  She met with Agent Garcia the next day to give her the devices.  Ms. Anderson testified that she never felt forced to give Agent Garcia the devices.  Ms. Anderson also confirmed that she identified Defendant and her living room in the screenshots Agent Garcia showed her.

Approximately one month after he left the residence, Defendant and a friend came in a U-Haul to collect the rest of Defendant's belongings and return Ms. Anderson's van.  Defendant did not mention the devices while they packed the U-Haul.  Ms. Anderson told Defendant that she gave the devices to Agent Garcia.  Ms. Anderson testified that Defendant appeared upset, but did not indicate that Ms. Anderson should not have done so.  Ms. Anderson gave Defendant Agent Garcia's contact information.

## APPLICABLE STANDARDS

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV; *United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011).  Generally, absent consent, a police officer must obtain a warrant supported by probable cause to justify a search or seizure under the Fourth Amendment.  *United States v. Hollins*, 336 Fed. App'x 921, 922 (11th Cir. 2009).  "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.  A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."  *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  Evidence obtained in violation of the Fourth Amendment must be suppressed.  *Jordan*, 635 F.3d at 1185.  The burden of production and persuasion rests upon the movant seeking to suppress evidence.  *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977).

### CONCLUSIONS OF LAW

#### A.      Abandonment of the Devices

Defendant maintains that he had a reasonable expectation of privacy in the devices.  (Dkt. 35 at 8.)   In response, the Government contends that Defendant did not have a reasonable expectation of privacy and Defendant's Motion should be denied because Defendant lacks standing to assert his Fourth Amendment rights.   (Dkt. 40.)   The Government argues that Defendant abandoned the devices when he moved out of the residence and did not bring the devices with him.  (Dkt. 40 at 7.)

To have standing to object to a search or seizure pursuant to Federal Rule of Criminal Procedure 41, one must have had a reasonable expectation of privacy.  *United States v. Colbert*, 474 F.2d 174, 176 (5th Cir. 1973).  "Further, it is settled law that one has no standing to complain of a search or seizure of property he has voluntarily abandoned."   *Id.* (citations omitted). Abandonment is assessed objectively "based on the prior possessor's intent, as discerned from statements, acts, and other facts."  *United States v. Sparks*, 806 F.3d 1323, 1342 (11th Cir. 2015); *accord United States v. Pirolli*, 673 F.2d 1200, 1204 (11th Cir. 1982), *cert. denied*, 459 U.S. 871 (1982).  The Eleventh Circuit considers "[a]ll relevant circumstances existing at the time of the alleged abandonment."  *Colbert*, 474 F.2d at 176 (citation omitted).  The "critical inquiry is 'whether the person prejudiced by the search . . . voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.'"  *United States v. McKennon*, 814 F.2d 1539, 1546 (11th Cir. 1987) (emphasis omitted) (quoting *Pirolli*, 673 F.2d at 1204). While Defendant bears the burden of proving a legitimate expectation of privacy in the areas

searched, the burden of proving abandonment is on the Government. *United States v. Ramos*, 12 F.3d 1019, 1022–23 (11th Cir. 1994) (citations omitted).

In arguing that he did not abandon the devices, Defendant relies on the Eleventh Circuit case *Sparks*, 806 F.3d 1323. (Dkt. 35 at 9–12.) In *Sparks*, the defendants left their cell phone at a Walmart store. *Id*. at 1329. A Walmart employee found the cell phone and agreed to return it to the defendants. *Id*. However, before meeting with one of the defendants to return the cell phone, the employee looked at the contents of the cell phone, which was not password protected. *Id*. The employee discovered child pornography on the cell phone and arranged for it to be turned over to law enforcement. *Id*. When the employee failed to meet the defendants to return the cell phone as previously agreed, the defendants knew how to find the employee. *Id*. Nevertheless, the defendants did not return to the Walmart store, nor did they ask for Walmart's assistance to find the cell phone or file a report with Walmart or law enforcement to retrieve the phone. *Id*. The Eleventh Circuit found that the defendants' decision to stop pursuing the cell phone was a "deliberate decision to abandon the phone." *Id*. The court also reasoned that the defendants engaged in "affirmative acts" demonstrating their intent to abandon the cell phone when they purchased replacement cell phones and filed an insurance claim for the lost cell phone. *Id*. at 1343.

Here, Defendant argues that the facts are contrary to those in *Sparks* and do not show an intent to abandon. (Dkt. 35 at 11.) Defendant contends that unlike in *Sparks*, the devices were not left with a stranger but with Ms. Anderson, whom Defendant lived with, "as husband and wife, for approximately four years." (Dkt. 35 at 11.) Defendant further contends that he did not lose the devices, but rather left them at the residence "after being kicked out . . . without his belongings." (Dkt. 35 at 11.) Defendant asserts that Agent Garcia "contacted Allison Anderson and had her

remove the tablet and cell telephone from Gregg's home and take it to the agents, circumventing the warrant process." (Dkt. 35 at 11.)

Despite Defendant's arguments, the Court finds that the facts here are similar to those in *Sparks*. According to Ms. Anderson's testimony, Defendant kept the subject cell phone on his person or near him while he used it. However, Defendant stopped using the subject cell phone when its front screen broke. During the second knock-and-talk, Defendant stated that he had not used the subject cell phone in over a year. (Def. Ex. 6 at 9:24–10:7.) Like the defendants in *Sparks*, Defendant bought a replacement cell phone and kept the same phone number. He then placed the subject cell phone in a drawer in a bedside table. When Ms. Anderson asked Defendant to leave the residence, he packed a bag of his belongings and his guitar to take with him to his mother's house. He chose not to take the devices with him, but did bring his replacement cell phone. Defendant also left his key to the residence. Ms. Anderson and Defendant continued to keep in touch in the weeks after his move. Yet, Defendant never asked Ms. Anderson to send the devices to him, nor did he mention them at all. Ms. Anderson testified that she repeatedly asked Defendant to return for his remaining belongings and eventually agreed to pack for him, whereupon she found the devices. Defendant also had ample opportunity to retrieve the devices as he traveled back to the Tampa area every Friday for his band practice. (Def. Ex. 6 at 12:13–13:5.) However, he did not return seeking the devices, never asked for them, and never demonstrated any interest in having them. Therefore, Defendant had "alternatives available to [him] to recover the [devices] with reasonable effort, but [he] instead made a deliberate decision not to do so." *Sparks*, 806 F.3d at 1347. Similar to the defendants in *Sparks*, Defendant did not engage in a single effort of any type to recover the devices, despite knowing where they were. *Id.* at 1345.

14

Defendant asserts that Ms. Anderson "originally agreed to safeguard and return the cell telephone and tablet" and "at the urging of law enforcement" she later removed the devices and gave them to Agent Garcia.  (Dkt. 35 at 15.)  However, this contention is inconsistent with Ms. Anderson's testimony.   Ms. Anderson credibly testified that Defendant never asked her to safeguard the devices.  Further, Ms. Anderson offered to bring the devices to Agent Garcia because she believed them to be important to the investigation.   Defendant further contends that Ms. Anderson's actions demonstrate Defendant did not abandon the devices because she informed Agent Garcia that Defendant "intended to get his property later."  (Dkt. 35 at 11.)   Nonetheless, Ms. Anderson testified at the hearing that upon his departure from the residence, Defendant took a duffle bag and that she wanted Defendant to retrieve the remainder of his belongings.  However, she clarified that Defendant expressed no interest in retrieving the devices.

Further, Ms. Anderson testified that it was not until almost one month after he moved out of the residence that Defendant returned.  Ms. Anderson informed Defendant that she had given the devices to Agent Garcia and provided him with Agent Garcia's contact information.  Even so, Agent Garcia testified that Defendant never contacted her regarding the devices.  When Agent Garcia offered to return the tablet to him during the second knock-and-talk, Defendant instructed Agent Garcia to give the tablet to Ms. Anderson for her to give to their daughter.  (Def. Ex. 6 at 21:4–5.)  These actions demonstrate Defendant's relinquishment of any ownership interest in the devices.

Defendant argues that the CPS investigation resulted in "Defendant being kicked out of his home, without his belongings."  (Dkt. 35 at 11.)  However, Defendant did pack a duffle bag of his belongings to bring with him and chose not to include the devices.  Additionally, to the extent Defendant contends that the CPS investigation negates his abandonment of the devices,

15

Defendant's argument lacks merit. "Police pursuit or the existence of a police investigation does not of itself render abandonment involuntary." *Colbert*, 474 F.2d at 176.

Defendant also refers to the Eleventh Circuit case *Ramos*, 12 F.3d 1019.  (Dkt. 35 at 12.) There, the defendant's two-month lease for a room in a condominium ended at 10 a.m. and another tenant was scheduled to move into the room at 2 p.m.  *Id*. at 1021.  A cleaning service was hired to clean the room to prepare it for the next tenant.  *Id*.  When they arrived at the room sometime between 11:30 a.m. and 12 p.m., the cleaning service employees noticed that the defendant had not moved out.  *Id*.  The employees began packing the defendant's belongings and found two dollar bills with white powder on them.  *Id*.  They also came upon a locked briefcase on the floor of the master bedroom.  *Id*.  Peering into the locked briefcase, the employees saw pieces of napkins wrapped with rubber bands.  *Id*.  The rental manager notified law enforcement, and a police officer arrived to observe the briefcase.  *Id*.  The police officer opened the briefcase with a pocketknife and, after the powder found in one of the bags in the briefcase tested positive for cocaine, relocked the suitcase and placed it under the bed.  *Id*. at 1021–22.  He then obtained a search warrant for the entire room.  *Id*. at 1022.

Based on those circumstances, the Eleventh Circuit held that the defendant had not abandoned his interest in the rental room and the briefcase.  *Id*. at 1025.  The court relied on the fact that the defendant retained the key to the room and that it was the practice of the building management to hold a tenant's personal effects until the tenant could be located.  *Id*. at 1024–25.  The court also specifically noted that the defendant called the management's office the day after he was scheduled to move out.  *Id*. at 1022, 1026.  The court explained that "an individual who overstays a two-month condominium rental by a few hours does not forfeit his privacy rights in a locked briefcase found inside the unit."  *Id*. at 1025.

Although this matter and *Ramos* both involve property left behind in the process of moving, Defendant's case is distinguishable from *Ramos*. Defendant here did not keep a key to the residence. Instead he gave it to Ms. Anderson. Further, while the defendant in *Ramos* called the management's office the day after the briefcase was discovered, Defendant never called Ms. Anderson to ask for the devices, nor did he attempt to retrieve the devices during his trips to Tampa. Notably, while the briefcase in *Ramos* was locked, Defendant left the devices in an unlocked drawer and closet in the bedroom he shared with Ms. Anderson. There is also a difference in time between the alleged abandonment and the search of the property in the two cases. In *Ramos*, the defendant's briefcase was searched within hours after the alleged abandonment. *Id*. at 1022. Here, Agent Garcia did not seize the devices until weeks after Defendant moved out of the residence and only searched the devices after obtaining a search warrant. Thus, *Ramos* does not support Defendant's argument.

Upon consideration of the circumstances here, the Government has met its burden of establishing that Defendant abandoned the devices and Defendant cannot establish that he had a reasonable expectation of privacy in the devices at the time of the search and seizure. *See McKennon*, 814 F.2d at 1546; *Colbert*, 474 F.2d at 176. The facts show that Defendant abandoned the devices when he left the residence without the devices and made no reasonable effort to retrieve them in the weeks thereafter. *Sparks*, 806 F.3d at 1344; *see also United States v. Lehder-Rivas*, 955 F.2d 1510, 1521–22 (11th Cir. 1992) (concluding defendant abandoned his suitcase where he asked an acquaintance to look after it for several months, promised to retrieve it, but never returned for it). Consequently, Defendant does not have standing to challenge the subsequent search and seizure of the devices. *Sparks*, 806 F.3d at 1341; *Colbert*, 474 F.2d at 177. Nevertheless, the Court will address Defendant's remaining contentions as argued in his Motion and at the hearing.

17

### B.    Ms. Anderson's Authority to Consent

Defendant argues that Agent Garcia could not have reasonably believed that Ms. Anderson had authority to consent to the search or seizure of the devices.  (Dkt. 35 at 16.)  In response, the Government contends that even if Defendant did not abandon the devices, law enforcement's seizure of the devices was appropriate based on Ms. Anderson's consent and Agent Garcia's reasonable belief that the devices contained contraband.  (Dkt. 40 at 11–15.)

Consent is an exception to the "requirements of both a warrant and probable cause." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  The individual giving consent must possess the authority to do so, *see Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990), and "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared," *United States v. Matlock*, 415 U.S. 164, 170 (1974).  Common authority rests "on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Matlock*, 415 at 172 n.7.  Further, "there is no Fourth Amendment violation if an officer has an objectively reasonable, though mistaken, good-faith belief that the consent he has obtained [is a] valid consent to search the area."  *United States v. Brazel*, 102 F.3d 1120, 1148 (11th Cir. 1997) (citing *Rodriguez*, 497 U.S. at 186).

Here, Agent Garcia seized the devices with Ms. Anderson's consent, but she did not search the devices until after obtaining a search warrant.  Defendant argues that Ms. Anderson never used or took possession of the devices until she was directed by Agent Garcia to bring the devices to law enforcement.  (Dkt. 35 at 17.)  However, both Ms. Anderson and Agent Garcia credibly

testified that during their telephone call, Ms. Anderson offered to bring the devices to Agent Garcia.  Agent Garcia was aware that Defendant and Ms. Anderson lived together for three or four years and had a child together.  Ms. Anderson told Agent Garcia that she found the devices in the home she shared with Defendant while packing his belongings.  Ms. Anderson explained that Defendant previously kept the subject cell phone near him, but he no longer used it as he had a replacement cell phone.  Further, Ms. Anderson testified that although she did not use it often, she previously used the tablet, and Defendant never indicated that she was not allowed to use the devices.  In fact, she was never prohibited from using Defendant's devices even after he learned that she searched through his e-mails on the tablet.  Ms. Anderson confirmed that she continued to communicate with Defendant after he left the residence and he did not ask for the devices.  Thus, given that Ms. Anderson had joint access to and control of the house, the bedroom, the closet, and the bedside table where she found the devices, and the lack of any indication that Defendant forbade her from using the devices, Ms. Anderson's consent was valid.  *See Georgia v. Randolph*, 547 U.S. 103, 133 (2006) ("If a person keeps contraband in common areas of his home, he runs the risk that his co-occupants will deliver the contraband to the police."); *United States v. Weeks*, 442 Fed. App'x 447, 453 (11th Cir. 2011) (finding girlfriend had apparent authority to consent to the search of an apartment where she treated the apartment as her home); *United States v. Stabile*, 633 F.3d 219, 231–34 (3d Cir. 2011) (concluding girlfriend had authority to consent to post-search seizure of hard drives where defendant was not present at search, girlfriend exercised joint access and control over the house, and hard drives were in common areas of the home accessible to her).

In his Motion, Defendant argues that Ms. Anderson's consent was not valid because Defendant was not given an opportunity to object to the seizure of the devices.  (Dkt. 35 at 18.) Nevertheless, Ms. Anderson possessed common authority over the devices, making her consent

valid against the absent, nonconsenting Defendant with whom that authority was shared. *Matlock*, 415 U.S. at 170 (finding "the consent of one who possesses common authority over premises or effects is valid against the absent, nonconsenting person with whom authority is shared"); *United States v. Thomas*, 818 F.3d 1230, 1240 (11th Cir. 2016) (same).   Further, as addressed above, Ms. Anderson informed Defendant that Agent Garcia had the devices and provided him with Agent Garcia's contact information.  Although he had the opportunity to contact Agent Garcia and object to the seizure of the devices, Defendant did not do so.

Defendant also contends that Ms. Anderson's comments to Agent Garcia made it clear that the devices belonged to Defendant.  (Dkt. 35 at 17.)  However, during the first knock-and-talk, Defendant consented to have the laptop searched.  Ms. Anderson subsequently informed Agent Garcia that the laptop was her work laptop.  It is therefore objectively reasonable that Agent Garcia would have believed Defendant and Ms. Anderson, having shared a home together for years, shared ownership of their electronic devices.  *See Brazel*, 102 F.3d at 1148–49 (finding officer's beliefs pertaining to consent to search a premises were "objectively reasonable" as they were consistent with his knowledge of the case).

In addition, the Government argues that Agent Garcia did not need consent or a warrant to seize the devices because Agent Garcia had probable cause to believe that the devices contained evidence relating to the child pornography investigation.  (Dkt. 40 at 14.)  A warrantless search or seizure is allowed where both probable cause and exigent circumstances exist.  *United States v. Burgos*, 720 F.2d 1520, 1525 (11th Cir. 1983).  Law enforcement may secure effects to prevent their loss or destruction when they have probable cause to believe that evidence of criminal activity may be located in the particular items.  *See United States v. Jacobsen*, 466 U.S. 109, 121–22 (1984); *United States v. Place*, 462 U.S. 696, 701–02 (1983); *United States v. Oates*, 619 Fed.

20

App'x 955, 958 (11th Cir. 2015); *United States v. Cooper*, 873 F.2d 269, 275–76 (11th Cir. 1989). Exigent circumstances may arise "when there is danger that the evidence will be destroyed or removed." *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) (en banc) (citation omitted). The appropriate inquiry is whether the objective facts would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured. *Id*.

At the time she obtained the devices from Ms. Anderson, Agent Garcia had probable cause to believe that the devices contained contraband. Agent Garcia testified that during the initial knock-and-talk, Defendant admitted to watching child pornography using an electronic means. Further, Ms. Anderson identified Defendant and the residence in a screenshot of username fla in Application A. (See Gov't Ex. 6.) Agent Garcia testified that she believed the devices contained contraband because Defendant did not disclose the devices during the initial knock-and-talk and instead gave her the laptop to search. Ms. Anderson later informed her that the laptop belonged to her. Further, Ms. Anderson explained to Agent Garcia that she believed there could be contraband on the devices as Defendant previously used them and kept the subject cell phone near him almost constantly. Accordingly, there was probable cause for Agent Garcia to believe the devices contained child pornography.

The question remains whether it was reasonable for Agent Garcia to believe that the devices might have been destroyed before a warrant could be secured. Agent Garcia testified that she believed Defendant intended to return to the residence. However, Defendant abandoned the devices at his former residence and never inquired about regaining possession of the devices. Considering the absence of evidence demonstrating that the devices were in danger of being destroyed or removed, the Government has not shown the existence of exigent circumstances. *See*

21

*United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002) (concluding exigent circumstances exist if immediate police action is required); *Tobin*, 923 F.2d at 1510 (finding exigent circumstances exist "when there is danger that the evidence will be destroyed or removed"). Nevertheless, as explained herein, Ms. Anderson's consent authorizing the seizure of the devices was valid.

### C.   Delay in Applying for the Search Warrant

In his Motion, Defendant argues that the Government's delay in obtaining a search warrant was unreasonable and violated his Fourth Amendment possessory interests in the devices. (Dkt. 35 at 19–21.) Agent Garcia seized the devices on October 26, 2016. (Gov't Ex. 5.) The Application for a Search Warrant was signed by Agent Garcia and the Court on December 7, 2016. (Gov't Ex. 13.) In her Affidavit, Agent Garcia specifically addressed why it took "several months for the multiple investigators working this case to identify [Defendant] as the 'fla' user within 'Application A.'" (Gov't Ex. 13 ¶ 29.) Agent Garcia clarified that she first became aware of the devices in late October 2016 when Ms. Anderson identified them, at which point she diligently began preparing her Affidavit. (Gov't Ex. 13 ¶ 29.) She further explained the detailed research of Application A and the ongoing undercover investigation required for the Affidavit. (Gov't Ex. 13 ¶ 29.) Agent Garcia concluded that any delay in seeking the warrant was reasonable based on the totality of the circumstances. (Gov't Ex. 13 ¶ 29.)

To determine whether a delay renders a seizure unreasonable under the Fourth Amendment, courts evaluate "the totality of the circumstances presented by each case." *United States v. Laist*, 702 F.3d 608, 613 (11th Cir. 2012) (citing *United States v. Mitchell*, 565 F.3d 1347, 1351 (11th Cir. 2009)). "[T]he reasonableness determination will reflect a 'careful balancing of governmental and private interests.'" *Soldal v. Cook County*, 506 U.S. 56, 71 (1992) (quoting *New*

*Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985)).  Factors considered in the reasonableness determination include whether the person consented to the seizure, the government's legitimate interest in holding the property as evidence, the significance of the interference with the person's possessory interest, the duration of the delay, and whether the police diligently pursued their investigation.  *Laist*, 702 F.3d at 613–14 (citations omitted).  "Given the complex interactions of these factors, this balancing calculus is fact-intensive and it is therefore unwise to establish a duration beyond which a seizure is definitively unreasonable or . . . even presumptively unreasonable."  *Id*. at 614.

The government generally has a legitimate interest in property when it has probable cause to believe the property contains contraband.  *See Illinois v. McArthur*, 531 U.S. 326, 331–32 (2001) (finding police had an interest in the property at issue because there was probable cause to believe the property contained contraband); *United States v. Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012) (holding the government "has a stronger interest in seizures made on the basis of probable cause than in those resting only on reasonable suspicion").  The government had a legitimate interest in holding the devices as evidence in this matter as the HSI agents had probable cause to believe they contained child pornography.

Having addressed the consent to the seizure and the Government's probable cause to believe the devices contained child pornography, *see supra* Section B, the Court considers the significance of the interference with Defendant's possessory interest in the devices.  The Government argues that Defendant's possessory interests in the devices were diminished.  (Dkt. 40 at 18.)  The Court agrees.  As addressed herein, *see supra* Section A, Defendant had ample opportunity to collect the devices from the residence.  Further, Defendant never contacted Agent Garcia to retrieve any non-contraband information from the devices, and there is no indication that

such a request would have been denied. *Laist*, 702 F.3d at 616 (explaining defendant's possessory interest in his computer and hard drives was diminished as defendant had an opportunity to remove files, defendant did not request any additional files prior to the time the government obtained a search warrant, and there was no indication that the government would have denied a request to retrieve additional non-contraband material on the computer). Also, Defendant admitted to Agent Garcia that he accessed child pornography, then was not forthcoming concerning which device he used. *Id.* (finding defendant's admission to the presence of child pornography on his computer diminished his possessory interest and enhanced the government's legitimate interest in maintaining custody of the computer); *United States v. Vallimont*, 378 Fed. App'x. 972, 975–76 (11th Cir. 2010) (finding diminished property interest where defendant admitted that computer had child pornography on it). Defendant therefore had a diminished possessory interest in the devices.

Next, the Court considers the duration of the forty-two day delay and whether the Government diligently pursued their investigation. This inquiry includes an examination of the nature and complexity of the investigation. *Laist*, 702 F.3d at 614. Defendant contends that the Government's reasoning in requiring additional time to research Application A and the means by which Defendant was identified as username fla is meritless because the Government had been investigating Application A and Defendant for over a year by the time Agent Garcia seized the devices. (Dkt. 35 at 21.) Despite Defendant's arguments, during the hearing, Agent Garcia clarified that she was not the agent investigating Application A. The undercover investigation was conducted by the Phoenix Agent and the Phoenix Unit, who observed username fla in Application A, subpoenaed internet providers, and conducted the research that eventually culminated in the investigative lead sent to Agent Garcia. Agent Garcia then spent numerous weeks reviewing the evidence, including hours of observing child pornography to identify evidence allegedly related to

24

Defendant.  Further, Agent Garcia testified that she had no prior knowledge of how Application A worked, nor did anyone in her unit.  Therefore, Agent Garcia frequently had to contact the Phoenix Agent to confirm the information in the investigative lead.  She further testified that the Phoenix Agent, as the head of the national investigation into Application A, was not always readily available to take her calls.  Agent Garcia dedicated considerable effort to the preparation of her Affidavit.  Her work in sorting through the facts of the Phoenix Unit's investigation and her own investigation of Defendant is extensively explained in her Affidavit.  (Gov't Ex. 13 at 18–26.)  Thus, although there was a forty-two-day delay between the Government's seizure of the devices and obtaining a search warrant, the delay was reasonable given the complex nature of the case.  *See Laist*, 702 F.3d at 617 (finding a twenty-five-day delay in obtaining a search warrant reasonable as the "investigation took roughly a year and involved the efforts of numerous FBI agents," and the affidavit explained a file-sharing system used to distribute child pornography, the underlying investigation that identified defendant, and the defendant's conduct).

Further, Agent Garcia testified that while she prepared the Affidavit, she continued to work on her open cases.  Her work included conducting interviews and surveillance, consulting with the forensics unit, and attending court proceedings for other cases.  She also provided support for the other units in the Tampa HSI office on other agents' cases.  Agent Garcia's testimony supports a finding that the Government's efforts were sufficiently diligent.  *Id*. (explaining that a delay was reasonable where agents' schedules were "extremely busy"); *Vallimont*, 378 Fed. App'x at 976 (concluding that a delay was reasonable in part due to agents' diversion to other cases).

During the hearing, Defendant argued that Agent Garcia's efforts were not diligent because she had all of the information she needed at the time she received the investigative lead to prepare the Affidavit.  However, Agent Garcia testified that she performed a knock-and-talk initially

instead of immediately applying for a search warrant because while she could confirm from the investigative lead that child pornography was available to Defendant in Application A, she could not confirm whether Defendant actually viewed child pornography. Her decision to perform the knock-and-talk was reasonable to gather this vital information. *See Oates*, 619 Fed. App'x 958–59 (finding agents' decision to perform knock-and-talk reasonable). Agent Garcia further testified that she did not apply for a warrant after the first knock-and-talk because she did not know of the devices' existence. Defendant not disclose the devices, and the laptop he did disclose did not contain contraband. She also testified that she began her work on the Affidavit immediately after obtaining the devices. Thus, Agent Garcia was diligent in pursuing her investigation. Considering the totality of the circumstances, the Court finds that the Government's delay in seeking the search warrant was reasonable and did not violate Defendant's Fourth Amendment rights.

### D.        Probable Cause Set Forth in the Affidavit

Defendant contends that the Application for a Search Warrant and Agent Garcia's Affidavit do not establish the probable cause necessary to support the search warrant. (Dkt. 35 at 22.) Specifically, Defendant contends that the Affidavit fails to set forth crime-specific facts regarding the inculpatory evidence in the devices and the likelihood that the evidence would be found in the devices. (Dkt. 35 at 23.)

In reviewing search warrant applications for probable cause, the issuing magistrate judge "is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999) ("Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair

probability of finding contraband or evidence at a particular location.") (citing *United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991)).  Courts reviewing the legitimacy of search warrants should use a "realistic and commonsense approach . . . so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations." *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994) (citation omitted); *Gonzalez*, 940 F.2d at 1419 ("Great deference is accorded to the magistrate's determination of probable cause.") (citation omitted).

Agent Garcia's Affidavit contained ample information from which the issuing magistrate judge could have concluded that there was a fair probability that the devices contained contraband or evidence of a crime.  Agent Garcia described how Application A worked and the ongoing undercover investigation into child pornography on Application A, then explained that an undercover agent observed username fla in Application A.  (Gov't Ex. 13 ¶¶ 10–17.)  Agent Garcia further explained that the Phoenix Unit issued the subpoenas for Application A to obtain the IP address associated with username fla and Bright House Networks for the account holder and physical address connected to the IP address.  (Gov't Ex. 13 ¶¶ 18–20.)   She explained that the Florida Department of Motor Vehicles revealed that Defendant had a valid Florida driver's license at the address connected to the Bright House Networks account.  (Gov't Ex. 13 ¶ 21.)

Agent Garcia then described her first knock-and-talk with Defendant, who matched the physical appearance of username fla, and his resulting admission to accessing Application A to view child pornography.  (Gov't Ex. 13 ¶¶ 22–23.)  She stated that Defendant told her he used the laptop to access Application A and consented to a search of the laptop, which yielded negative results.  (Gov't Ex. 13 ¶ 24.)   Agent Garcia detailed her subsequent conversation with Ms. Anderson and how Defendant had the devices during the time investigators observed username fla

accessing Application A. (Gov't Ex. 13 ¶¶ 25–26.) She explained that the laptop Defendant claimed to use was Ms. Anderson's laptop. (Gov't Ex. 13 ¶ 25.) Finally, Agent Garcia included that Ms. Anderson identified Defendant as username fla in screenshots from Application A.

Given all the circumstances set forth in the Affidavit, an issuing magistrate judge reviewing the search warrant application could reasonably conclude that there was a fair probability of finding evidence of accessing, possessing, distributing, or receiving child pornography on the devices. *Gates*, 462 U.S. at 238; *Brundidge*, 170 F.3d at 1352. Thus, the Application for a Search Warrant and Agent Garcia's Affidavit contain factual allegations sufficient to show probable cause.

### E. Exclusionary Rule Would Not Apply

The Government contends that even if Defendant's above arguments prevailed, suppression is not the proper remedy. (Dkt. 40 at 20.) The Government argues that the actions of Agent Garcia and law enforcement do not rise to the level of negligent conduct to warrant the harsh sanction of exclusion. (Dkt. 40 at 22.) Defendant did not address this argument.

"Exclusion exacts a heavy toll on both the judicial system and society at large" as it requires courts to ignore evidence bearing on guilt. *Davis v. United States*, 564 U.S. 229, 237 (2011) (citation omitted). Thus, exclusion is necessary only as a "last resort." *Id*. Application of the exclusionary rule is appropriate only when the deterrence benefit of suppression outweighs its substantial societal costs. *Id*. Specifically, "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systematic negligence." *Herring v. United States*, 555 U.S. 135, 144 (2009). The exclusionary rule should not be applied "to deter objectively reasonable law enforcement activity." *United States v. Leon*, 468 U.S. 897, 918 (1984). In other words, when law enforcement acts with a "reasonable good-

faith belief" that their conduct is lawful, the exclusionary rule should not be enforced. *Davis*, 564 U.S. at 238–39.

Here, Agent Garcia displayed caution in performing a knock-and-talk before seeking a search warrant. After finding no evidence of contraband on Defendant's laptop, Agent Garcia did not go forward with a search warrant, believing the laptop to be the only device Defendant would have used to access Application A. When she learned from Ms. Anderson that Defendant possessed the devices during the time in question, Agent Garcia obtained Ms. Anderson's consent to seize the devices. She then proceeded with a search warrant and relied in good faith on the warrant to search the devices. These actions do not demonstrate deliberate, reckless, or grossly negligent disregard for Defendant's Fourth Amendment rights. Rather, Agent Garcia's actions were objectively reasonable. *Leon*, 468 U.S. at 926 (finding "[i]n the absence of the allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if police officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause"); *United States v. Parker*, 600 F. Supp. 2d 1251, 1259 (M.D. Fla. 2009) (same). Suppression here would do nothing to deter police misconduct as there is no apparent police misconduct. *Davis*, 564 U.S. at 240 (stating the sole purpose of the exclusionary rule "is to deter future Fourth Amendment violations"). As such, the harsh sanction of exclusion should not be applied. *Id*. (declining to apply the exclusionary rule where police officers' conduct did not violate defendant's Fourth Amendment rights deliberately,

recklessly, or with gross negligence).

## CONCLUSION

For the reasons set forth above, the Court **RECOMMENDS** that Defendant James Robert

Gregg, Jr.'s Dispositive Motion to Suppress Evidence (Dkt. 35) be **DENIED**.

**IT IS SO REPORTED** in Tampa, Florida, on December 14, 2017.


JULIE S. SNEED
UNITED STATES MAGISTRATE JUDGE


Copies furnished to:
The Honorable Virginia M. Hernandez Covington
Counsel of Record

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and

Recommendation's factual findings and legal conclusions.   A party's failure to file written

objections waives that party's right to challenge on appeal any unobjected-to factual finding or

legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R.

3-1.